Case number 20-5295 Jodi Breiterman appellant versus United States Capitol Police. Ms. Chambers for the appellant, Ms. Sindian for the affiliate. All right, Ms. Chambers, we'll hear from you. Thank you. May it please the court, Anita Chambers for appellant Jodi Breiterman. There are two issues before us. First, the balancing of interests under the First Amendment. Second, the standard for comparator evidence under Title VII. As to the First Amendment claim, the underlying facts are critical. On January 29, 2015, a male officer left a loaded handgun in a restroom of the Capitol Visitor Center. Counsel, may I suggest that we have read the briefs so we're familiar with the facts? Yes, Your Honor. I will skip ahead. As it relates to the First Amendment claim, in construing all facts in light most favorable to Mr. Breiterman, Breiterman showed that her interest outweighed that of the government. In Hull v. Ford, the D.C. Circuit instructed- Before we get to that argument, can we get to whether or not under Garcetti, she's speaking as a private citizen. Isn't this an instance where, the same as Garcetti, she's disclosed something that she has specifically been tasked to investigate? I mean, this was her job. She was doing her job by taking this photo. In this photo that was disclosed, isn't it completely akin to the memo that was disclosed by the prosecutor in Garcetti and therefore outside the protection of the First Amendment? Your Honor, I think that this case is distinguishable from Garcetti for a few reasons. First, I just want to point out as a preliminary matter that the lower court did find that Breiterman was speaking out as a private citizen on a matter of public concern. But going to your question- Will we review all of this de novo? Yes, Your Honor. Breiterman was one of several officers who reported to the scene and took a photo. Several other officers took a photo. The actual incident is different than the memo in Garcetti because the event was in a publicly viewable space. It wasn't that a Capitol Police officer could be the only person taking that photo. Anyone who had access to that bathroom could have taken that photo, could have viewed that photo. And so in that way, the actual subject matter is distinguishable from that of Garcetti. But the matter was under investigation. So disclosure of a matter that was under investigation seems to be contrary to the powerful government's interest. Well, Your Honor, Ms. Breiterman didn't know whether or not the matter was under investigation. She was never contacted. She was never told that there was an investigation. And the officer who left the gun was carrying the gun and on duty just days after. So she did not know that there was an investigation. Further, the record shows that there are other comparators who took photos, for example, of a car crash where there was an active criminal investigation and Capitol Police did not demote those officers. So going back to the balancing of interests, what is key here is that Breiterman's disclosure was regarding something that was a pattern at Capitol Police. The reporter who reported on this incident... Can I interrupt to just follow up on Judge Silberman's question? Does it matter whether she knew that it was under investigation or does it matter that or is the relevant point that it was under investigation? And do you have any authority to support that First Amendment protection turns on whether she knew that it was under investigation? Your Honor, I believe that the elements to prove a First Amendment retaliation claim do not include that requirement of whether something was in investigation or even more specifically to whether it was a matter of public concern or under her duties. So no, I don't have any authority. On that particular point. All right. Thank you. So going back to the incident of the gun, the reporter had been writing articles on unattended guns left at Capitol Police for months prior to publishing the photo that Breiterman provided. And so this was a pattern. This was not an isolated incident. This was a pattern of unattended guns that were continuing to happen. So when Breiterman spoke to the reporter Hess and provided the photo, she was doing it out of public concern for a continual harm that was not being addressed. And it continued to happen for many months. In fact, when the investigator talked to Breiterman, the reporter talked to Breiterman, she knew of two other instances of unattended guns, which Breiterman did not know about. What about her, the government's concern that as a supervisor, she would jeopardize her relationship with subordinates by turning over information to the press that embarrassed other people, whether they were under investigation or not. Wouldn't that undermine her trustworthiness from the point of view of subordinates? Well, Judge, there's a couple of points on that. First, Capitol Police does not consistently discuss a supervisor and its role in discipline. In other cases where there are officers who are of higher rank than Ms. Breiterman commanders, Capitol Police makes no mention about trust supervision or the impact on subordinates. Well, are there circumstances like this? I mean, if I were an officer under your client's supervision, I would not feel confident that she would support me in situations similar to this. Right. Well, Your Honor, Ms. Breiterman, before this had occurred, had been an officer, had been a sergeant for 13 years and was very well regarded as the record shows. So this was truly a matter of a very public safety issue that was continuing to be a problem that she spoke out about. And so that's the difference. And I understand your point about trusting a subordinate, but again, this reporter also... The subordinate trusting the supervisor. The subordinate trusting the supervisor. Well, I think that Ms. Breiterman's track record of the past 13 years and the fact that she was a sergeant speaks for itself. And also this officer who left the gun was not one of her subordinates. It's true. But if I were one of her subordinates, I would feel vulnerable to similar treatment. Isn't that logical? Yes, Your Honor. But when other supervisors have done things like solicited sex in a text message to a subordinate, Capitol Police did not raise the issues of trust or trusting a subordinate and did not demote that commander. So I agree with you, but Capitol Police has not been consistent in the way it administers discipline. You make a point, incidentally, of how much time it took as indicating a procedural irregularity. Correct. But don't you... Isn't it possible that the government was thinking, this is a touchy case. We have to put a lot of attention to it and reasonable men and women could debate on what the proper remedy was. I think that just took into account. And of course, your client had indicated the likelihood of protesting. So you want to make sure you're doing the right thing. So I don't see why the length of time it took them to decide what to do and that there was debate on that question undermines the government's interest at all. Well, Your Honor, that was just one factor in showing pretext because Capitol Police itself admits that that is probably one of the longest investigations it has done. And into looking into Breiterman's phone and doing another investigation into text messages she had with supervisors. So the length of time and the scope, I think, show that the length of time was unreasonable and Capitol Police admits that itself. Further, the officer who actually left the gun was not put on any type of suspension, was not... But of course, she didn't know that. Well, she saw him a few days after the incident carrying a gun and on duty. Yes, but that doesn't in any way indicate what discipline is going to be imposed. And in fact, discipline was imposed. Correct. He received a few days suspension while Miss Breiterman got demoted. You're not saying there are comparators, are you? This particular comparator, no, Your Honor. In the record, we provided other comparators, including people of more senior rank than Miss Breiterman. Can you just explain why the emergency suspension was a procedural irregularity? Yes. Capitol Police testified that emergency suspensions are rare. They're limited to very specific situations that did not meet Miss Breiterman's situation. But for Miss Breiterman, they put her on emergency suspension and then kept her on suspension for 11 months. So it's by Capitol Police's own admission that this is unusual. Was she put on emergency suspension for 11 months or she was put on emergency suspension for a day and then put on administrative leave with pay for 11 months? The latter, Your Honor. It was initially an emergency suspension and then she was put on paid administrative leave where she had to stay at her house during working hours and not leave. And paid administrative leave is not a procedural irregularity, right? Correct. The issue is the length of time, the 11 months. Correct. So the irregularity is using emergency suspension to initiate things and having the administrative leave with pay last for 11 months rather than what? I mean, how long was it supposed to last under the procedures? Well, I think the procedures don't specify a time frame, but all other comparators that were in the record, the record doesn't show anyone else on administrative leave for anywhere near 11 months. If anything, the officers just received a few days suspension or lesser punishments like written warnings. And just one point, if I may, what is critical is that the information that Ms. Breitman was trying to disclose, it was embarrassing. It did paint Capitol Police in a negative light, but that is why it's so important that the First Amendment protects this type of disclosure. This type of information is helpful for the public to know. It's helpful for public safety. It's helpful for in fact, Capitol Police and Congress tried to enact things in light of learning of this information. So though it may have been embarrassing to Capitol Police and negative, that is precisely why it is so important to protect. Counselor, one of the things that puzzles me and I see very little in the case law that illuminates. I think there's only one case we could find where the matter was even mentioned. Does it make any difference whether someone openly expresses a view as opposed to whether one leaks to the press about a fellow officer? I don't believe that that is one of the elements that's necessary for stating a retaliation claim under the First Amendment. And I agree with you, that there is limited case law about that nuanced distinction of whether it's publicly expressed or not. In this case, Capitol Police asked Breiterman if this was her photo, she admitted that it was. And so ultimately Capitol Police and many of its officers knew that the photo that was in the article was from Breiterman. Judge Rao, I apologize. I may have been interrupting you while you were about to question. Did you have a question for counsel? No, that's fine. Thank you. I see I'm over my time. All right. If there are no further questions, we'll hear for counsel for the Capitol Police and we'll give you a couple of minutes on rebuttal, Ms. Chambers. Thank you. Good morning. May it please the court. My name is Kelly Sindian. I represent the United States Capitol Police. This case is about a management employee who believes that she had a unilateral right to disclose confidential information she obtained on behalf of the department to the media without prior authorization and in direct violation of the department's policies. As a result of her actions, she was disciplined. Judge Kelly reviewed this case below and determined that the first amendment did not preclude the department's discipline in this matter. Judge Kelly also determined that appellant failed to produce any facts, any material facts showing a dispute as to whether the appellant was discriminated against or retaliated against in violation of the Congressional Accountability Act. Now, Ms. Chambers has argued that this case only concerns two issues, whether the department's interest outweighs those of Ms. Breiderman's and whether the comparators in this case were appropriately similarly situated for a jury to reach the question as to whether Ms. Breiderman was discriminated against. I submit that those are not the only issues in this case. As Judge Wilkins correctly pointed out, in the case of Garcetti, the Supreme Court determined that where an individual speaks as an employee as opposed to a citizen, the rights of the first amendment do not apply to restrict an employer's actions as to that individual. And the reason for this is because what the first amendment... Excuse me, counsel. Isn't that a somewhat slight overstatement? I don't believe it is, Your Honor. And the reason why is because what the first amendment does is it allows an employee, irrespective of their status as a on which they would be allowed to speak on anyway, as a citizen of this country. And so when you have an employee who instead is reporting about issues related to, and I shouldn't say related to, but specifically reporting on issues as a part of their job, the department gets to determine how that is done. The department gets to determine who it's done for. The department gets to determine whether that information is provided and in what form. And here you had an employee who was responsible for investigating a matter, in this case, an unsecured weapon in a bathroom at the Capitol. That employee went to the scene as part of her job. She documented the scene. She took notes on the scene and she took a picture. And then she provided that information to a media outlet without any consultation with the department, despite a specific restriction that requires officers to run such media inquiries through the department's public information office. Miss Cindy, doesn't the public have some interest in knowing about potential problems with safety in the Capitol Police? I mean, should we think about that as a matter of public interest, on which Miss Breiderman was trying to get information out to the public? I would argue that the public interest, the interest of the public or the interest of Miss Breiderman in disclosing the information doesn't become an issue unless we determine that she's speaking on a matter of public concern. So while the public may have an interest in public safety concerns, such as an unsecured weapon in the Capitol, that doesn't become a factor unless we first determine that the information that Miss Breiderman was communicating to the media specifically concerned a matter that she would speak to anyway as a citizen. Let me ask a question, counsel. Suppose instead of providing the picture to the press, Miss Breiderman had volunteered to testify before Congress because the incident had been disclosed in another way, and she had volunteered to testify before Congress because she thought it was a systemic problem. Would she be demoted? Would she be subject to discipline? I think the example that you've come up with, Your Honor, concerning a congressional hearing in which she's required to testify or volunteers to testify. No, no, she volunteered. She volunteered to send a letter to Congress saying this is a dreadful situation that a gun was allowed to be left in a bathroom in a situation where the Speaker of the House and other senior members could have been threatened. And I volunteered to testify before Congress. Well, to go to the example... Wasn't your position so extreme that you could punish her for that? Potentially, yes, Your Honor. And the reason why is because of the first part of what she said, she sends a letter to Congress disclosing information regarding her job responsibilities and what she found as part of an investigation into a matter the department asked her to investigate. She does not have the authority to disclose that information. The department determines who that information goes to. So even if it were a congressional hearing on the topic matter and she volunteered this information to members going over the heads of the department, it would still be a problem for the very reasons that I identify. The department gets to control how information it gathers through its employees is used. Excuse me. I didn't want to interrupt you, Judge Silverman. Let me just see if I could just take another step. Suppose she had reported that up through the chain of command and she was told, we don't think it's of significance. So he left the gun on the top of the toilet. So what? We think it's of no consequence whatsoever. Is she then still forbidden from going to the public or Congress? Well, to be clear, what she's forbidden from doing here is revealing evidence and information she gathered as part of an investigation that she was directed to gather. That's what she's prevented from doing under the Garcetti test. And so I would argue if that is what she intends to do with Congress, if she intends to take evidence from an investigation and provide it to personnel outside of the department without authorization, if she intends to take the facts she gathers and testify as to that without authorization, then yes, Garcetti applies. So Ms. Sinian, it seems that your argument ultimately must rely very heavily on the fact that she cannot speak as a citizen on any matter that is a part of her job. So even if she follows the procedures, you know, and she reports them, she can never speak about this matter to the press or to Congress because she gathered this information in her official capacity. Is that your position? So to be clear, I want to make sure that we're not being overly broad here. So what I'm saying is it's not any matter related to her job because there is case law that suggests that you can speak to issues related to your job. What I'm suggesting is in this instance, she developed a work product for the department. She went out, she gathered information, she investigated, she created a work graph, and she took that information and that work product and released it when she did not have authorization to do it. That is the problem in this case. Now, if she were to, in some other way, speak about concerns she had about public safety issues that didn't concern the factual matter that she gathered on behalf of the department, there may be some reason to believe that that speech would be speech of a citizen. But here, there is no evidence that what she was speaking about had to do with the same speech rights that would be available to any citizen by virtue of them being a citizen. What she was speaking to specifically had to do with the documents and work products she gathered on behalf of the department while investigating a matter. And that's where she ran into specific issues because we have a policy that prevents her from doing exactly what she did. And I want to be clear as to why this policy exists. The department does hundreds of investigations, hundreds, and we cannot have a situation in which employees are determining because they feel there may be a concern and they only have a view of what the department itself has. They have a very narrow view as to what is happening in the department. And so making a decision ad hoc that they are able to disclose whatever they choose to disclose because it may be of interest to the public is detrimental to the mission of this organization. Let's suppose there's an officer whose duty was to respond on January the 6th and responded. And that officer, she has concerns based on what she saw on January 6th as far as security failures, etc. And she takes those to the press. Are you saying that officer is or is not speaking as a private citizen? So that's a great example, Your Honor, because that's exactly what has happened after January 6th. We've had a number of officers speak to the press about their experiences on that day. And those those communications are protected because what they're speaking about is not a work product they created on behalf of the department. What they're speaking about is an experience that they had on that day that was very public. That's what they're speaking about. What they're speaking about is their opinions as to the department's successes and or failures. That's what they're speaking about. They're not describing specific information or, you know, releasing work product that they created on behalf of the department. That they've not been permitted to do. Cindy, and how that is different, though, because they were there in the Capitol in their official capacity. And they were, you know, protecting the Capitol as part of their official capacity. So why is that an example in which they would be speaking as a citizen? Is it only because they didn't take a specific photograph or write a specific report? I mean, I'm not sure that the distinction about whether one is speaking as a citizen or as an employee can really turn on that distinction. Right. And I don't think it turns on solely the distinction as to whether they were in their official capacity as it concerns whatever it is they're speaking to. I think what it turns on is the idea that when the department commissions work, when it requests an employee to a particular task, that that employee does not get to choose how that task is done. The department gets to choose that. Who that task is done for, the department gets to choose that. Excuse me, counsel, just a second. If Ms. Brightman had not been involved in this investigation at all, she didn't find the gun. But let's suppose she got a copy of the picture or she didn't get a copy of the picture. She went to the roll call to tell the story because she thought it was injurious to the public and to the congressman they're charged with protecting. But it was not part of her job. It was not part of her investigation. Is your position different then? I think, your honor, it would depend on highly individualized facts. But I think we're closer to the point as to where she would be speaking as a citizen. And I say that because if you look at the information she disclosed here, it literally was, I reported to the scene at X time. The scene was X location. This is what we saw at X location. Here is the evidence. In other words, she was providing the very information that the department requested her to provide. And that would typically be provided as part of a criminal report. My hypothetical is she's not involved in the investigation at all, but she learns about it and she goes to the press with it. I understand. And so what I'm asking is, does she have the type of information that she provided here? Well, she got it. Let's assume she got it from somewhere, somehow. And she disclosed that to the press. Now, what's your position on that? My position would be that she's still disclosing information the department commissioned from an officer. So the fact that she received it from the officer who was actually investigating and chooses to disclose it, she's still speaking as an employee. If she's simply speaking about her concerns about public safety, and let's assume that she had a concern about the way the department handles these cases, and that she felt that they were inadequate in the way that the department handles these cases, and she provided an opinion as to that subject matter, we would not have the issue that we have under Gochetti. We have the issue because she specifically released information that was a work product. Ms. Cindy, isn't your argument strongest on the second prong here about balancing, you know, the employer's interest versus the employee's interest? I mean, this question about whether she's speaking as a citizen seems to be a much more difficult question than perhaps the balancing at the second prong. I do think that our interests as the department far and vastly outweigh Officer Breiterman's interest in speaking on this topic matter. And I want to go back to what Judge Silberman noted earlier. The department's concern, which was articulated throughout its documentation in this case, was that Breiterman was a supervisor. She was a information regarding personnel issues, regarding various department plans and procedures, regarding our strategies. And given that she took it upon herself to disclose this information to the media, that really undermines the department's utility for her. And I mean that in saying that in terms of other subordinate employees, Officer Breiterman, well, when she was a sergeant, would have or could have been responsible for investigating discipline as it concerned other employees. And so when you have part of the process investigating these disciplinary matters is that it is confidential. And the reason why is because we need to encourage employees to bring forth information. We need to encourage them to be truthful. So if I understand your position now on my hypothetical, that an employee has gained information, not through her investigation, but because someone told her about it, someone, and she went to the press, you would still say that was violating your confidentiality rules. And you would still be entitled to discipline her because she would not be talking as a member of the public. Is that your position? My position is a little bit more nuanced than that, in that when it comes to these issues of First Amendment, it's about the form, content, and context. So it really depends on the information that she discloses. If it were the same type of information she discloses in this case, the fact that she didn't acquire it through herself going to the scene, I don't think is relevant. The fact is the department acquired it in that manner and through that means. And just because she came, she was able to get a hold of the information, does not somehow entitle her to disclose it. If she's strictly speaking from a policy sort of, I disagree with this, or this is an issue for me, or something to that effect, I think we're outside of the Garcetti rule. Now you're relying, as my colleague Judge Rao put it, now you're relying on the balancing test rather than the investigation question, aren't you? I don't think so, Your Honor, because... That wasn't a negative question. I think I was just picking up on what Judge Rao was pointing. I am correct, Judge Rao, aren't I? I was reading your mind. Yes. I will say I don't think that for purposes of determining whether someone is speaking as a citizen or as an employee, it's not a matter of the balancing. It is a matter of determining what it is they're speaking about, the content, the form, and the context. And so to the extent that she's still providing information that was related, not related, concern this investigation, that were the details of this investigation, to be more specific, she's still within the Garcetti realm. Whereas if she's speaking from sort of an opinion, a place of opinion such as the officer, the detective in the Hawkins matter, that's a different, that is a different, inherently different type of speech that's seen as requiring and necessitating the highest level of protection. That's not what this was. This was disclosing direct information she obtained from an investigation. That's what she did here. And for that reason, she falls under Garcetti. I do see that I'm well past my time. So I will, unless there are further questions, I will stop here. All right. Any further questions from the panel? All right. Thank you. We'll give Ms. Chambers two minutes in rebuttal. Thank you, counsel. Thank you. So Ms. Cindy talked about the form content and context of the information being disclosed. The gun was left in a public bathroom at the Capitol Visitor Center. Therefore it was not an area that only Capitol police officers could access or would have access to. Breiterman was one of several officers who reported to the scene and she took her own picture of the gun, as did several other officers. After that, Breiterman heard nothing about an investigation. She wasn't interviewed. So to say that she was part of an investigation or received the information from the Capitol police or that this information was confidential, that's simply not in the record. Also- On top of a toilet? I don't know, Your Honor, but it does seem like there was several guns that have been left, as we pointed out in the record, in parking lots, in a gun in the speaker's house found by a child. So this happens. And I'd also like to point out, Ms. Cindy pointed out that Ms. Breiterman's a supervisor there. She's held to a different standard. But I would like to point you to the record at the appendix 2031, which is the comparator of the male commander who sent sexual text messages to the female subordinate. And Capitol police said that the male's actions, quote, violated the department's trust and damaged its credibility, but he got a 20-day suspension. And then just very quickly, there's another comparator who was an officer, but he took a photo of an active crime scene, posted it on Facebook. There was a criminal investigation. It was a fatal car crash, and he only got written warnings. And there was no discussion about his rank or title. Thank you. Thank you. We'll take the matter under advisement.
judges: Wilkins, Rao, Silberman